Good morning. Kevin Fong, Pillsbury Winthrop, representing appellants, the Confederated Tribes of the Chehalis Reservation and CTGW, a limited liability company. I'd like to reserve three minutes for rebuttal. May it please the court. The issue on appeal is whether the county is barred from imposing a property tax on several buildings that are located as permanent improvements on a limited liability company that in turn is majority owned by the Chehalis tribe. The buildings are on, again, reservation land that was purchased by the tribe and is now being held in trust by United States. So let me begin with the principle that really should control this case. That is, permanent improvements on Indian land may not be taxed by a state or county. That principle was made clear by the Supreme Court in United States v. Rickard in 1903. And three decades later, Congress enacted the Indian Reorganization Act. In section 465 of that act, Congress provided that the United States could take land into trust for a tribe and that any trust lands, quote, shall be exempt from state and county tax. May I ask you about Mescalero? We have a situation here where you have this, I guess, is it a joint venture? Is that the nature? The joint venture. And then you have the reversionary clause down the road. If you didn't have some tribal touching, so to speak, of the lodge and there was no ownership, no reversionary interest, would the same principle hold under Mescalero? I think the exact same result would be required under Mescalero because the rationale of Rickard and Mescalero doesn't depend on the ownership of the permanent improvements. It's the fact that they are permanent and they are located on reservation land that's being held in trust by the United States. So while we don't need to reach it in this case, I think that's the necessary consequence of the Mescalero holding. And interestingly enough, that's also the result that is set forth and required by the Bureau of Indian Affairs new regulations, which I'll get to in a moment. But first, going back to the facts of our case. Remember, in this case, we also have a record showing that a tax exemption for these buildings would be entirely consistent with the process by which the land was taken into trust by the United States. I'm going to summarize in about 30 seconds seven pages of our opening brief, but in short, the tribe purchased the land itself in 2002 at the suggestion of the county, which had hoped to promote economic development. The tribe then applied to have the land taken into trust, and in the course of that application, it made clear to everyone, including the United States, that it was going to lease that land to a joint venture so that there could be construction of a convention center and hotel. It wasn't a secret. It wasn't a surprise or anything like that. The county itself was asked for written comments. This is all part of the usual process when land is taken into trust. And in particular, the county was asked to address, what do you think about the impact on property taxes? And the county said, well, you know, we would lose $10,000 in property tax from the assessed role. But at the end of the day, the county did not oppose the project and, in fact, supported it. So based on all of that, BIA approved taking the land into trust, in large part citing specifically the county's support. So all of that fits together with the case law. You have a process where there's careful consideration by the administrative agency, BIA, taking the land into trust. But once that's done, once you have the land taken into the trust, then any permanent improvements are governed by Mescalero, which in turn was new regulations. As the court knows from our request for judicial notice, there are new regulations which require the same result as Mescalero. And almost in the exact... Can I ask a question about those? As I was reading them, they start with the phrase, subject only to applicable federal law. And opposing counsel, the county argues, well, that means that the regulations are essentially neutral because they would be subject to BRAC or, I guess, also to Mescalero. And so they don't really preclude the court from considering all the same issues that you've raised. How do you interpret that language? My explanation is that BIA wanted to recognize that there are a few isolated, narrow exceptions where, in fact, Congress has authorized state and local governments to impose taxes on permanent improvements. The one narrow exemption that comes to mind is for oil and gas leases. So Congress knows how to expressly authorize a property tax on a permanent improvement when it wants to. It hasn't done so here. There's no exception that Congress has mandated for hotels, for convention centers, for indoor water parks. So my best guess is the subject to language in the new regulation is BIA's recognition that Congress has spoken and specifically authorized taxation in a few narrow circumstances. But absent any such express authorization by Congress, there cannot be any state or local tax on a permanent improvement. So you read applicable federal law as some sort of statutory enactment as opposed to federal judicial? Correct. I read it as an express authorization by Congress that's required. And, of course, in that situation, BIA will defer to Congress's judgment as it must. But absent any such express authorization by Congress, then this really does become a Chevron deference case if you think that the statute is miscleral. You could actually end the case right after miscleral, end period, and conclude right there. But if you think you do need the assistance of the agency interpretation, then you look to the new regulation. One other thought. There is yet another way to get to the same result as miscleral without even looking at the new regulation if you don't want to get to the Chevron deference issue. And that is just as a matter of pure statutory interpretation. So go back to when Congress enacted Section 465 in the mid-1930s. RICARD had already been on the books for 30 years by that time. There is, according to standard principles of statutory construction, a presumption that when Congress enacted Section 465, it knew of RICARD. It necessarily knew of RICARD because RICARD was a U.S. Supreme Court case on the books dealing with property taxes by state and local governments. That's one presumption. Congress is presumed to know. The second presumption is that Congress is presumed to have let that case law stand unless it expressly overruled it in the statute. So because of those two presumptions, the presumption in the mid-1930s that Section 465 knew of RICARD and because it was silent and expressed no intent whatsoever to overrule it, it intended to let RICARD stand. So in fact what you have is almost a congressional statutory embracing or acquiescence to the RICARD principle when it passed 465 in the mid-1930s. Is there an effect that, I take it the landed issue went from being non-reservation land to reservation land sometime in 2010? And Mescalero seemed to distinguish between those and said RICARD was aimed at reservation land. Does that make a difference for us here? I don't think so. Mescalero by its facts is not exactly our situation to begin with. Well, first of all, Mescalero involved ski lifts. It didn't involve a building per se. And Mescalero also was dealing with land that was tax exempt because it was being held by the federal government all along during the course of time. And there's a little footnote in Mescalero where the Supreme Court notes, well, yes, the government could have taken it into trust, but that would have been pointless because the U.S. already held title to the land. So the distinction that permanent improvements are necessarily exempt from state or local property taxes is essential to the holding in Mescalero. If you took that one sentence or one paragraph out, then Mescalero makes no sense at all. And, of course, the other distinction is Mescalero went on to address a use tax rather than a property tax. If anything, our case is stronger where you have a property tax because that directly implicates the interests of the United States as holder of title and holding the property in trust. So I hope that answers your honest question. Well, finally, what you've all been waiting for, Chevron deference. The regulation, sub A, says that permanent improvements on leased land are not subject to state or local taxation. And that's true, quote, without regard to ownership of those improvements, close quote. As set forth in our request for judicial notice, this regulation is entitled to Chevron deference because it's a clarification. It fills a gap in the express statutory law. And because Congress has authorized BIA with extraordinarily broad powers, but among them the power to conduct notice and comment rulemaking, that Congress would have assumed that BIA would step in and fill any gaps in the statutory law as necessary. Don't we have a limit on, in considering whether an agency has the authority to determine the preemptive scope of a statute and regulations? The Supreme Court has been very narrow on that and essentially said unless Congress has expressly delegated to an agency the authority to explain the preemptive scope of a statute, then it doesn't have that authority. Is there some basis for saying that Congress intended the BIA to explain where the state and local governments were preempted from imposing a tax? I think the assumption that Chevron deference would be applied sparingly to preemption or federalism issues was true until last month when Justice Scalia's opinion, majority opinion in the city of Arlington versus FCC sort of threw cold water on that idea. That was the agency's jurisdiction rather than preemption. It wasn't directly a preemption issue, but there's one paragraph in there where he talks about federalism issues, which are essentially the sort of family that preemption is in, and he says that federalism doesn't make a difference. Chevron deference is Chevron deference. I know there are some references in various footnotes and opinions suggesting that Wyeth, the U.S. Supreme Court's decision in Wyeth, could be read as limiting the application of Chevron deference in preemption cases, but rereading Wyeth, Wyeth itself is not a Chevron deference case. It was dealing with Skidmore deference rather than Chevron deference. So I agree there has been uncertainty. Hopefully last month it was all cleared up by Justice Scalia's opinion in the city of Arlington, but if not, this court can always avoid the issue by just relying on Mescalero itself, or as I explained, the principles of statutory construction. Would you address the Fort Mojave case and where it fits into the structure? Fort Mojave is not a property tax case. It's a tax on a possessory interest, and it doesn't deal with permanent improvements. It dealt with taxation of the leasehold interest, essentially the intangible interest. So I think Fort Mojave probably does not fall within the Mescalero, Rickard, Section 465, BIA regulation line, because it's not a property tax case and it's not a permanent improvement case. So agree or disagree with Fort Mojave, it's just different from our case here. If the court may, I'll reserve my minute and a half for rebuttal. Good morning. May it please the court, my name is Scott Cushing. I represent Thurston County et al. And Thurston County respectfully asks this court to affirm the district court's decision based on three reasons, which Mr. Fong brought up only one of them. First, relating to the Great Wolf Lodge improvements are subject to tax because they are owned by CTGW LLC, a Delaware company. Second, the Great Wolf Lodge improvements are subject to tax because under a Brocker analysis, the state interests outweigh the federal and tribal interests. They infringe on the tribe's sovereignty. So with respect to United States v. Rickard and Mescalero, both of those cases, excuse me, state that permanent improvements on Indian land are not subject to tax. But they're distinguished here because unlike what Mr. Fong states, the ownership issue is key in those cases. And they apply to very specific facts that simply aren't present here. The holding in Rickard was that individual Indians' improvements on their allotments were not taxable. But the impetus for that holding was that the taxes would impair the federal policy under the Allotment Act, including the obligation to convey fee title free of encumbrances at the end of the allotment period. Also, the holding was based on the Federal Instrumentality Act, which the court no longer considers as a basis for taxing Indians. And further, the Rickard holding is quite narrow based on the language that the court used in describing the taxed individuals. They stated that permanent improvements cannot be taxed upon lands allotted to and occupied by Indians. And the court further goes on to say, this is in 1903, that the Indians were wards of the nation under the complete authority and protection of the United States. They're in a condition of pupillage or dependency or a dependent race. And they possess weakness and helplessness and need to be protected. And so there's no chance that this court or any court would consider CTGW in the same terms. And that can't be ignored and the Rickard holding should not be broadened to encompass the facts that we have here. In Mescalero though, in footnote 13, they mention sort of offhand, well it's unclear what ownership interest, how it's being held. And nothing seems to turn on that in Mescalero. So we don't know if it's a corporation, we don't know what it is, but it doesn't matter. In any event, the question of tax immunity cannot be made to turn on the particular form in which the tribe chooses to conduct its business. So similarly here, we've got an LLC with a 51% ownership in the tribe. So it's hard to see how the Supreme Court really relied on that in Mescalero. How the Supreme Court relied on what? I'm sorry, I missed that. The ownership structure of a particular group that's at issue. It's hard to separate the ownership issue in Mescalero, however, because that was a tribal business that owned and operated this ski resort on United States land. And so I guess it's our contention that you can't separate the two. The ownership issue is key to that holding. I'm still having trouble why the ownership issue is key there. What language do you point to that supports that? The consistent use of, well, it's a use tax in that case. So in, let's see here, yes. The court held that the personality installed in the construction of the ski lifts as part of the tribe's use of the land was not subject to taxation. And the court considered the personal property be, like as Mr. Fong says, permanently attached to the realty. But it also stated it is intimately connected to the use of the land. And that immunity from taxation of the land must be extended to the improvements. So I would take that and I would say that this is intimately connected to the tribe's use of the land here, isn't it? The tribe's use of the land here, in our case? There is no tribal use of the land here. Well, there is through the joint venture. No, well, I understand Your Honor's point where you're going with that. But it is a 51% proportionate share of the profits and losses. Correct. Okay, so. And then what happens at the end? Was it 25 years or whatever? At the end of the lease? It reverts to the tribe, yes. But that's not where we're at today. No, I know we're not there. But I'm just, it's not like that it's a hands-off on the tribe. The way you're describing it, you're trying to suggest that it's almost as if the tribe is just some ancillary aspect of this. To CTGW? You're right. Yes, that's correct. They benefit from that LLC, certainly with the profits and losses. Certainly not the losses, but the profits. And also through their taxation of the property. And not of the property, but of the sales tax for beverages and goods and services. And also through their hotel room tax. Right. So that's really the benefit right now. I'm not, I haven't seen the tribe's or the Great Wolf Lodge's books. I have no idea where they're at in terms of profitability. But if that comes to fruition, then they would get benefit from that. But it is. Okay, but I guess, just correct me if I'm wrong. Sure. But I thought in particular this tribe, in terms of where its property has been located, and the reason that this land was taken in for us to begin with, was to give the tribe some resources, if you will, and to move it toward more self-sufficiency. Is that true? I agree with that completely. And why then doesn't it make sense, when you read these cases in context, that the improvements go with the land? Because it would hardly make any sense to say, okay, well, you happen to be on a flood plain, I'm going to give you this piece of land, but of course you're going to have to pay tax on it if you do anything on it. It just seems inconsistent with the whole scheme. But disabuse me of that. No, I agree with that in terms of the land. You're absolutely correct in terms of that. So what Mr. Fong was talking about earlier in terms of Thurston County giving input and encouraging the tribe to purchase land, that's fine and that's great, and that's relating to the land, assuming that any construction or any business that the tribe decided to put on there would be the tribe's business. And that's not what we have. We have an outside company, Great Wolf Resorts, who contracted with the tribe to build this LLC, and this LLC is a state-chartered corporation to be looked at in terms of, at least what Cohen states, that if any state-chartered company is to be treated as non-Indian, even if owned by Indians, and that's exactly what we have here. So I guess if your honors believe the mescalero holding applies here, then certainly there's no need for BRACR, and that permanent improvements attach to the land, and then it's all full stop. But I still don't believe that that is the case because you have to read the mescalero and RICARD in context. And mescalero refers to RICARD and basically uses that rationale, that exact language, that permanent improvements attach to the trust land, comes from RICARD, which I believe is far afield from where we are today. And so if mescalero basis is holding on RICARD, then that doesn't apply either. Let's assume you went to BRACR. Are there any cases where BRACR has been applied to permanent improvements? No. But I guess in our case, since there are no property tax issues, at least that neither of us have found, and certainly if we had, we'd have presented them to you. But that simply just goes to how the court decides to weigh under BRACR. If the permanent improvements issue is a piece of it, I mean that could go to your balancing tribal interests or federal interests. But also, even if the court decided that, you'd have to believe that mescalero applies. And then if mescalero applies, then BRACR doesn't. So it's kind of, you know, it's one or the other. Right. I'm just asking if we got to BRACR. And if we got to BRACR, there are some sort of disagreements between the parties about the services and whether the county's been compensated or not. Oh, sure. In your view, if we got to BRACR, is it still a summary judgment issue or do you think there's factual issues? I don't think there's a factual issue. It's certainly a summary judgment. Because I think the services that I believe you're referring to may be the money paid to the sheriff's office, $50,000 or some such, and also to the fire department. But the money paid to the sheriff's office is in part of the tribe's compact to pay for offsets to gaming. So it's part of their gaming compact. So they're required to pay that regardless. That's the 2% funds. So it has nothing to do with property tax. Further, I believe it's $160 or so paid to the fire district. Well, that's to the tribe's property as a whole, not specifically to the Great Wolf Lodge. So that, too, is not part of the property tax issue. And I don't remember this or not, but I believe that they called out other payments that they made for utilities and things of that nature. But those are certainly not property tax issues either. That's just a bill that anybody pays for the water that you use, electricity, et cetera. Can you also address the impact of the regulations and respond to opposing counsel's arguments? Absolutely. Could you also address whether they would be applicable retrospectively? Sure. First, I believe, as you stated earlier, that the BI regulations simply restate what the current law is today. And that is that BRACA applies to permanent improvements on trust land if owned by a non-Indian entity. And that's exactly what we have here. And the clause that you pointed out, subject only to applicable federal law, is the key clause. That has nothing to do with if Congress expressly states whatever it is that Mr. Fonga talked about. So the reason I get to that is because the preamble states that the tribes have inherent plenary and exclusive power over their citizens and territory, which has been subject to limitations imposed by federal law, including but not limited to Supreme Court decisions, which, of course, means BRACA. And then the preamble continues. When analyzing under BRACA, in the case of leasing on Indian lands, the federal and tribal interests are very strong. So clearly the BIA is contemplating BRACA. And that's the way to go because the language they use ahead of time in the actual Section 162.017a, the permanent improvement language there is directly from Mescalero. But I believe that the BIA recognizes that BRACA is the appropriate way to analyze these cases. And one other thing about what the preamble states about stating whether tribal interests and federal interests are very strong, I think it's perfectly appropriate for the BIA to state that those interests exist when dealing with leasing property on Indian land, but it's inappropriate for them to preassign a weight to these interests, which I believe usurps the Court's authority to do a particularized inquiry under BRACA. You need to look at each case sort of anew and weigh the facts relative to the facts in the present case and not assign a preassigned weight to that. So does that get to your Honors? Thank you. As far as Chevron is concerned, I don't believe it applies. I didn't speak to retroactivity. First of all, I don't believe that Chevron applies at all because there's no statute that we're interpreting here or attempting to. Will they say that Section 465 and 415 give them the authority to enact this as sort of a gap-filling measure? Sure. He did say that in his argument. That's not in the briefs. It's more about it's as if the regulations themselves are the statutory scheme that we are to be interpreting. At least that's how I read the brief. And that doesn't really stand to reason that the agency would then interpret its own regulations. Well, Section 465 does say tax exempt, that the Indian rights and lands are tax exempt. And so the regulations, as I understand what the BIA did, are explaining what that means in this particular context. I see. Could be. Again, I understand that that's what the argument was here. I didn't see that in the briefs. But it's true. It speaks to 465 and 415 speak to land. And we're not dealing with an issue where we're taxing land, although I understand that it's the permanent improvements on the land, and that's the nexus that they're trying to draw. I'm not sure, Your Honors, if you'd like me to address Bracker or if the briefs are sufficient for that. Well, I think the ---- It's quite lengthy. No, I mean, it's your choice. But we certainly ---- the briefs are well done, and we know the competing ---- you know, each of you has laid out the competing interests. I guess ultimately if we were to go to Bracker, it's a legal judgment on where the scales tip. Correct. Yes, it's definitely a weighing interest and certainly to be looked at anew. I guess one other thing that wasn't raised was the tribal sovereignty issue. And it's true that the tribe certainly has a federal interest in tribal economic development and self-sufficiency, but the court has said that this interest without more does not defeat a tax on Indians. And while the tribe has federal interest against the alienation of Indian title, that interest doesn't apply here because we're dealing with a non-Indian entity, CTGWLLC, not the federal government or the tribe. And all of this comes down to when the tribe purchased the land and took it into trust, CTGW took over, and that's the situation. So with that, Thurston County asks that this court affirm the district court's decision. Thank you. All right. Let me address one question posed by Judge McEwen, one question posed by Judge Ikuda, and then I'll wrap up. On the trust versus reservation, it is indeed a two-step process. First, the land is taken into trust, and then thereafter it's by proclamation made part of the reservation. Here, the first step occurred in 2006, and that's what triggers Mescalero. It's the taking of the land into trust that triggers the Mescalero analysis. Turning to Judge Ikuda's question, I'm not even going to repeat the retroactivity analysis, but it is on page 6 of our motion for judicial notice. If the court has any particular questions, I'd be glad to answer it, but otherwise I think it's laid forth there, the five-part test under Seldovia. Interestingly, the county talks more about the preamble than the regulation itself. If you look at the text of 162.017A, there's no ambiguity there. There's no reference to Bracker. It is a straight interpretation of the statute which adopts the Mescalero rule. In conclusion, times change, policies change, regulations change, but if we want to know what the current policies are, the best and the authoritative word on that is the preamble to the regulations set forth by BIA. That sets forth what the policies are now, not in the 1900s, not in the 1930s, but now, and BIA is very clear. The interests here in the policies of the federal government are to promote self-sufficiency, to promote strong tribal governments, and to promote self-determination. Here, the rule set forth in 162.017A, as well as in Mescalero, does all of those, and putting aside Chevron deference, BIA's determination is entitled to Skidmore deference, and to the extent the court wants to look at policy at all, that's what it should look to. Thank you. Thank you. Thank you both for your arguments today and also for the very helpful briefing from both parties. The Confederated Tribes versus Thurston County.
judges: Alarcon, McKeown, Ikuta